Christopher L. Springer (SBN 291180)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497
cspringer@kellerrohrback.com

*Attorney for Plaintiff*

*Additional counsel listed on signature page*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| Xavier Smith,<br><br>                     Plaintiff,<br><br>  v.<br><br>PayPal Holdings, Inc.,<br><br>                     Defendant. | No.<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Xavier Smith alleges the following based upon personal knowledge, information and belief, the investigation of his attorneys, and publicly available materials. He brings this case, on behalf of himself and all others similarly situated, against Defendant PayPal Holdings, Inc. ("PayPal").

## I.    INTRODUCTION

1. Affiliate links connect shoppers, content creators, and retailers in the digital economy. Each affiliate link is a unique URL posted by a content creator to earn commissions on products the creator recommends. When a member of the creator's audience clicks on an affiliate link and purchases a recommended product, the creator receives a portion of the sale as compensation. This process is seamless to the shopper and rewards affiliates who drove the sale.

2. Browser extensions are small software programs that add features to a user's internet browser. Honey, now offered by PayPal, is one such browser extension. PayPal claims that Honey helps its users save money by finding and applying coupon codes during the online shopping checkout

process.

3. Honey may or may not save its users money, but it makes a lot of money for itself. Among other unscrupulous practices, it recently came to light that Honey makes money by inserting itself into the affiliate marketing operation.

4. When a shopper with Honey installed clicks an affiliate link and purchases a product, the content creator who posted the link should receive the affiliate commission for the sale, because they provided the last link or affiliate code that was clicked before the user made their purchase.

5. Instead, as revealed in YouTuber MegaLag's video,[1] the Honey browser extension intervenes at the last second, replacing the affiliate code with its own. As a result, PayPal receives the affiliate commission owed to the content creator—even though Honey played no role in referring the shopper to the retailer. Moreover, Honey replaces the affiliate code even when it finds no coupon code for the shopper.

6. Through these deceptive practices, Honey deprives creators of the revenue they depend on to sustain their businesses.

7. Plaintiff Xavier Smith is an entrepreneur and author who shares knowledge about fitness, nutrition, and life skills. As part of his business, he recommends products to support his audience's fitness and nutrition goals. He posts affiliate links to these products and others on Facebook, LinkedIn, Instagram, Threads, Pinterest, Twitter/X, and other platforms. His income from affiliate links varies between approximately $500 and $2,500 per month. In 2023, he began to see a decrease in these commissions of several hundred dollars per month. He attributes the decline to Honey's interference.

8. Smith's example is not isolated. Honey's technology operates behind the scenes to affect any and all affiliate codes during checkout and redirect commissions to itself.

9. While Honey markets itself as a tool to help users save money, its practices come at a significant cost to creators like Smith. California law prohibits such conduct, which constitutes conversion, unjust enrichment, intentional interference with contractual relations and prospective

---

[1] MegaLag, "Exposing the Honey Influencer Scam" (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk.

economic advantage, and which violates the California Unfair Competition Law. Smith is bringing this lawsuit on behalf of himself and others similarly situated in order to recover what has been lost.

## II.     JURISDICTION AND VENUE

10. This Court has original subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one member of the proposed class is a citizen of a state different from that of the defendant PayPal; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and the proposed class comprises more than 100 class members.

11. This Court has personal jurisdiction over PayPal under 28 U.S.C. § 1407, because PayPal has sufficient minimum contacts in the Northern District of California, and because PayPal has otherwise intentionally availed itself of the markets within the Northern District of California through business activities, such that the exercise of jurisdiction by this Court is proper and necessary

12. Venue is proper under 28 U.S.C. § 1391(b)(1) & (2) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of California and because PayPal maintains its principal place of business in the District.

## III.     PARTIES

### A.     Plaintiff

13. Plaintiff Xavier Smith resides in Arizona. Mr. Smith is an entrepreneur and author who shares knowledge about fitness, nutrition, and life skills. As part of his business, he recommends products to support his audience's fitness and nutrition goals. He posts affiliate links to these products and others on Facebook, LinkedIn, Instagram, Threads, Pinterest, Twitter/X, and other platforms. His income from affiliate links varies between $500 and $2,500 per month. In 2023, he began to see a decrease in these commissions of several hundred dollars per month. He attributes the decline to Honey's interference. Smith has never himself used Honey and did not know that Honey was stealing his affiliate commissions.

### B.     Defendant

14. Defendant PayPal Holdings, Inc. was incorporated in Delaware in January 2015. It transacts business and is headquartered at 2211 North First Street, San Jose, California 95131. PayPal is a leading technology platform primarily known for enabling digital payments and facilitating

commerce experiences on behalf of merchants and consumers worldwide.

15. PayPal acquired Honey Science Corporation in January 2020 for approximately $4 billion. In 2022, PayPal rebranded the subsidiary as PayPal Honey. The company operates a browser extension, called Honey, that purports to automatically apply online coupons on e-commerce websites.

## IV. FACTS

16. In the mid-2000s, it came to light that a man named Brian Dunning had orchestrated a scheme to exploit eBay's affiliate program. Using a technique known as "cookie stuffing," Dunning's websites secretly planted eBay affiliate cookies on visitors' browsers. This happened without their knowledge or any direct interaction with eBay links. If those visitors later shopped on eBay, the system falsely credited Dunning as the referrer, allowing him to claim commissions for sales he had no role in generating. The scheme, which operated undetected for years, funneled millions of dollars in illicit earnings to Dunning. After an extensive investigation, federal authorities charged him with wire fraud, leading to his guilty plea in 2013. Dunning was sentenced to 15 months in federal prison.

17. PayPal has taken a page out of Dunning's playbook. Through its Honey extension, it too improperly inserts its own affiliate cookies on shopper's browsers. As a result, affiliate marketing programs falsely credit Honey as the referrer, allowing it to claim commissions from sales it had no role in generating. Its scheme has funneled millions of dollars in illicit earnings to PayPal. Whereas Dunning stole from eBay (which otherwise would have paid no commissions on the sales), Honey is stealing from anyone who uses affiliate links, from large product recommendation websites to small-scale content creators.

18. This complaint will describe how it all works: the affiliate marketing landscape, the role of browser extensions, Honey's marketing, PayPal's scheme to skim affiliate commissions, and the harm caused to content creators.

A. **Affiliate links**

   1. **The use of affiliate links**

19. A content creator is someone who produces material such as videos, articles, podcasts, or social media posts to engage an audience and earn income from their work. Creators generate revenue through sponsored content, affiliate marketing, ad revenue, merchandise sales, and/or

subscriptions.

20. Affiliate links are special links that content creators use to make money online. When a creator shares an affiliate link on his social media platform, it directs his audience to a product or service on a retailer's website. If a person clicks on the link and buys something, the creator who shared the link earns a commission, which is usually a small part of the sale price or a set amount.

21. Creators can share these links on various social media platforms. The timing and method of sharing depend on the platform and the affiliate's audience. On Instagram, creators might include links in their bio, stories, or captions. On TikTok, they place links in their bio or share them in the comments of their videos. YouTube creators might include affiliate links in their video descriptions or pinned comments, often alongside product reviews or tutorials. Twitter users may tweet links along with engaging posts. Creators can also use platforms like Facebook or Pinterest, where links can be shared in posts, groups, or on boards.

22. The creators who use affiliate links are often sharing products they love. They might be bloggers, influencers, or everyday social media users who have built trust with their audience. Creators often spend time researching products, creating content, and engaging with their followers to make sure their recommendations are helpful and genuine. By doing this, they not only earn money but also provide value to their audience by highlighting useful or interesting products.

23. Some creators rely on affiliate commissions for bonus income—perhaps several hundred dollars a month. Other creators develop sufficient audience engagement to earn a living from affiliate commissions alone, allowing them to pursue and share their passion online.

**2.   The operation of affiliate links**

24. Affiliate links operate through unique URLs and cookies. When someone clicks an affiliate link posted by a content creator, the link contains information about the creator, such as their unique ID. An affiliate link might look like a normal website link but with extra text added. For example, a link to a product might be "www.company.com/product" while an affiliate link could be "www.company.com/product?affiliate=12345". The extra part at the end ("?affiliate=12345") is what tracks the affiliate's unique ID.

25. The affiliate link passes data to the retailer's website, which stores the data in a

"cookie" on the customer's device. A tracking cookie is a small piece of data that a website stores on a user's computer or device to monitor online activity. It acts as a virtual note that allows the website to remember specific actions, such as visited pages or items placed in a shopping cart. Some cookies can also track activity across multiple websites, often for targeted advertising or analytics purposes.

26. Cookies associated with affiliate links track the customer's activity, such as browsing and purchasing. If the customer makes a purchase of the relevant product within a certain period, the creator earns a commission.

27. To address the scenario where a user has clicked on multiple affiliate links before making a purchase, the affiliate marketing industry, for the most part, uses the "last click" model to assign attribution for the referral. That model attributes the sale to the affiliate who provided the final link clicked by a customer before making a purchase. This system is designed to attribute the revenue to the source that directly drove the conversion. For example, if a customer clicks on an affiliate link on a blogger's website but later clicks a different affiliate link from another source before completing their purchase, the second affiliate—the one with the last click—is the one who gets credit for the sale.

28. Major companies like Amazon, Walmart, and Target offer affiliate programs. Amazon's Affiliate Program, often called Amazon Associates, allows affiliates to earn commissions by promoting millions of products sold on its platform. Affiliates can generate links for specific products and share them with their audience. Commissions vary depending on the product category.

29. Walmart's Affiliate Program operates similarly, offering links to a variety of products. Affiliates earn a percentage of the sales they drive, and the program includes tools to help affiliates track their performance. Target also provides an affiliate program that appeals to affiliates promoting household goods, clothing, and other everyday items.

30. Specialized companies, such as Shopify or Bluehost, also run affiliate programs tailored to specific audiences. Shopify's program is popular among entrepreneurs and small business owners, while Bluehost's affiliate program is aimed at people promoting web hosting services.

31. How much money an affiliate earns depends on factors like the commission rate, the price of the product, and how many people ultimately buy products recommended through their links.

B.   **Browser extensions**

32.   An internet browser extension is a small software program that enhances the functionality of a web browser. Extensions are designed to perform specific tasks or add features that improve the user's browsing experience. They can be installed directly from the browser's extension store or marketplace, such as the Chrome Web Store or Firefox Add-ons site, and are typically lightweight, meaning they use minimal system resources.

33.   Browser extensions work by integrating with the browser's architecture and running alongside it. They often add new buttons, menus, or tools to the browser's interface. For example, an ad blocker extension might prevent advertisements from displaying on web pages, while a password manager extension could help users securely store and autofill their login information.

34.   Extensions operate using permissions granted by the user during installation. These permissions allow the extension to interact with web pages or access specific types of data. For example, an extension that saves shopping deals might request permission to read and modify the content of websites visited by the user. While these permissions enable extensions to function, they can also raise privacy concerns if data collection practices are not transparent.

35.   Most extensions are built using web technologies like HTML, CSS, and JavaScript, making them easy to develop and compatible with various browsers. They can be updated regularly to fix bugs or add new features, ensuring they remain useful and secure. However, users are advised to install extensions only from trusted sources and to review permissions carefully to avoid potential security or privacy risks.

C.   **The Honey browser extension**

36.   The Honey browser extension is a specific example of a tool designed to save users money while shopping online. Once installed, Honey integrates with the browser and becomes active when users visit online shopping websites. Honey purports to scan for potential coupon codes, discounts, or deals that might apply to the items in the user's shopping cart. At checkout, it automatically tests these codes to determine if any of them work, in theory, applying the best discount it finds.

37.   Honey is free to use and can be added to popular internet browsers like Chrome,

Firefox, or Edge. Once installed, it operates in the background as people shop.

38. Honey, formerly operated by Honey Science Corporation, was founded in 2012. By 2018, Honey reported annual revenue of $100 million, with a 100% growth rate.

39. PayPal acquired Honey in 2020 for about $4 billion.

40. As of this filing, approximately 18 million users have downloaded the Honey browser extension. Honey reports that it looks for coupons from more than 30,000 online retailers.

41. Honey applies coupons using a multi-step process. First, when a user reaches the checkout page of a supported website, Honey identifies the platform and its coupon code input fields. Next, it connects to its database of known coupon codes for that specific retailer. This database is built from various sources, including partnerships with retailers, user-submitted codes, and publicly available promotions. Once Honey retrieves the available codes, it runs an automated trial-and-error process, inputting each code into the appropriate field and evaluating whether it successfully reduces the total cost.

42. During this process, Honey monitors the response from the retailer's website to determine which codes are valid and applicable to the items in the cart. For example, some codes may only apply to specific product categories or require a minimum purchase amount. Honey filters out invalid or inapplicable codes and purports to highlight the one that provides the greatest savings. If no codes work, Honey informs the user but still attempts to display other potential savings opportunities, such as cashback offers or related deals.

43. Honey also offers a rewards program called Honey Gold. This feature enables users to earn points (Honey Gold or PayPal Rewards) while shopping at participating stores, which can later be redeemed for gift cards. By offering these points, Honey incentivizes customers to complete their purchases through the extension.

44. To function effectively, Honey requests permissions to read and modify the content of websites visited by the user. This enables it to identify the shopping site, detect the items in the cart, and interact with the checkout process. In addition to applying a coupon code, Honey also inserts its own affiliate code, so that it receives any available affiliate commissions from its users' purchases.

45. The company has been criticized for false advertising and misleading claims about its

ability to consistently find the best discounts. Some reports suggest that Honey, in partnership with retailers, intentionally ignores better deals, only offering deals that the retailer has approved.

**D.     Honey's theft**

46.     For those shoppers who have Honey installed, Honey intercepts affiliate cookies created by content creators' affiliate links and replaces them with its own affiliate code. This practice redirects the commission from the original creator to Honey, depriving the creators of their rightful earnings.

47.     Honey's ability to alter affiliate cookies is rooted in its browser integration and permissions. When a shopper clicks on the Honey extension pop-up to apply a coupon, Honey removes the content creator's affiliate cookie and replaces it with their own.

48.     Honey manages to do this by discretely opening a small new tab, which acts like a simulated click on an affiliate link (even though the shopper is already on the checkout page for the website). That page loads the affiliate cookie into the user's browser, replacing the creator's affiliate cookie. Honey then automatically closes the new tab. The permissions Honey requests from its users allow Honey to open and close the small new tab (and install its own affiliate cookie along the way).

49.     Because affiliate marketing operates on the "last click" model, Honey gets the credit for the sale. Honey's scheme is especially effective because it inserts its cookie at the very last point of the transaction, as the shopper is completing the checkout process. Content creators cannot compete with Honey's access to the last moment of the shopping journey.

50.     Honey inserts its own affiliate cookie (and thereby diverts commissions from creators) even when it does not find any coupon for the shopper.

51.     Honey's affiliate cookie replaces affiliate links when a shopper: applies a coupon from Honey; clicks on the Honey extension pop-up to accept Honey Gold (or PayPal Rewards); clicks "Got it" on a pop-up that says that Honey did not find any rewards; or just when prompting the user to check out with PayPal.

**E.     Harm to content creators**

52.     Mr. Smith is an entrepreneur and author who shares knowledge about fitness, nutrition, and life skills. As part of his business, he recommends products to support his audience's fitness and nutrition goals. He works hard to create content that will interest his audience and lead them to click on

the affiliate links that he posts. He partners with affiliate programs to receive commissions when his audience buys products that he recommends.

53. He posts affiliate links to these products and others on Facebook, LinkedIn, Instagram, Threads, Pinterest, Twitter/X, and other platforms. His income from affiliate links varies between $500 and $2,500 per month.

54. In 2023, Mr. Smith began to see a decrease in these commissions of several hundred dollars per month. He attributes the decline to Honey's interference.

55. Mr. Smith has never himself used Honey and did not know that Honey was stealing his affiliate commissions.

## V. STATUTE OF LIMITATIONS

56. Honey did not disclose its affiliate-code-replacement scheme. Instead, Honey relied on technical complexity, user trust, the affiliate marketing process, and its own marketing to actively conceal its conduct.

57. The technical complexity of affiliate cookie replacements obscured Honey's actions. Honey's operations occurred entirely in the background. Once the extension was installed, it integrated seamlessly with the browser and monitored user activity on shopping websites without any visible indication of its interference with affiliate cookies.

58. Honey relied on user trust and permissions granted during installation. By requesting broad access to modify webpage content, Honey could replace affiliate codes as part of its purported coupon search process. Honey users were unaware of the technical details or implications of these permissions.

59. Content creators had no direct visibility into this process. The substitution of Honey's affiliate cookie happened during the shopper's checkout, after the shopper had left the content creator's site. Content creators had no mechanism to track whether their codes were being replaced or otherwise altered. Content creators typically rely on reporting tools provided by affiliate programs to monitor clicks and commissions. However, these tools do not reveal if or when the affiliate codes were replaced mid-transaction, leaving affiliates unaware of the potential loss of revenue.

60. Honey's promotional messaging focused heavily on its consumer benefits, such as

saving money through automated coupon applications. This marketing diverted attention from Honey's interactions with affiliate marketing. By framing itself as a tool for user savings, Honey avoided scrutiny from both shoppers and content creators regarding its broader impact on affiliate marketing.

61. Thus, any applicable statute of limitations has been tolled.

62. In addition, PayPal's actions and omissions constitute overt acts that began a new statute of limitations because those acts advanced the unfair objectives of the scheme. Each replacement of an affiliate code constitutes a new and independent act that perpetuates the scheme.

## VI.     CLASS ALLEGATIONS

63. Mr. Smith brings this case as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), on behalf of himself and all other similarly situated.

64. Mr. Smith brings this case on behalf of a class as defined as follows: All people who lost revenue that they would have otherwise received from affiliate links because PayPal overrode their affiliate cookie information with its own.

65. Excluded from this class are PayPal and its employees or agents and any judicial official presiding over this action, and members of their families.

66. There are thousands of members of the proposed class, and the class is thus so numerous that joinder of all members is impracticable.

67. PayPal has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the class as a whole

68. Common questions of law and fact exist as to all members of the class. These questions predominate over any questions solely affecting individual members of the class. Among the questions of law and fact common to the class are:

   A. Whether PayPal used the Honey browser extension replaced content creator's affiliate codes with its own;

   B. Whether PayPal received commissions that were properly awarded to content creators;

   C. Whether PayPal unfairly took advantage of the operation of affiliate codes in order to reap commissions for itself;

      D.       Whether PayPal's conduct was knowing and willful;

      E.       Whether PayPal actively concealed this conduct;

      F.       Whether PayPal's practices were unfair and deceptive;

      G.       Whether class members consented to PayPal's practices;

      H.       Whether PayPal's conduct violated California laws;

      I.       How much PayPal profited from its practice;

      J.       Whether PayPal is liable for damages; and

      K.       Whether PayPal's conduct should be enjoined.

69. Mr. Smith is a member of and will fairly and adequately represent the class, protecting the interests of the class members. Mr. Smith has retained competent counsel experienced in class action litigation and intends to prosecute this action vigorously.

70. Mr. Smith does not have interests antagonistic to, or in conflict with, the interests of the other members of the class.

71. Mr. Smith's claims are typical of the claims of the members of the class.

72. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII.   CLAIMS

### COUNT ONE — CONVERSION

73. Mr. Smith brings this claim on behalf of himself and the nationwide class.

74. Mr. Smith incorporates the allegations above.

75. PayPal wrongfully exercised control over Mr. Smith's property.

76. Mr. Smith had the right to possess the commissions from purchases made by members of his audience who clicked on his affiliate links and completed a purchase of the product or products associated with the link.

77. PayPal substantially interfered with Mr. Smith's right to possess those commissions by knowingly or intentionally replacing Mr. Smith's affiliate codes with its own and thereby taking possession of the commissions that Mr. Smith would have otherwise received.

78. Mr. Smith did not consent to this practice—indeed, he had no idea that PayPal was

using the Honey browser extension to convert his property in this manner.

79. Mr. Smith was harmed because he lost out on commissions that he would have otherwise received. He received less income from his affiliate link business.

80. PayPal's conduct was a substantial factor in causing Mr. Smith's harm: but for PayPal's replacement of the affiliate codes, Mr. Smith would have received the commissions when shoppers used his link and completed a purchase.

81. Thus, PayPal owes to Mr. Smith the amount of commissions that it stole from him through its affiliate-code-replacement scheme.

## COUNT TWO — RESTITUTION BASED ON QUASI-CONTRACT OR UNJUST ENRICHMENT

82. Mr. Smith brings this claim on behalf of himself and the nationwide class.

83. Mr. Smith incorporates the allegations above.

84. PayPal must restore to Mr. Smith commissions that PayPal received from online third-party retailers, but that really should belong to Mr. Smith.

85. Mr. Smith is entitled to restitution because PayPal knew or had reason to know that PayPal diverted affiliate commissions that would have been properly paid to Mr. Smith.

## COUNT THREE — INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

86. Mr. Smith brings this claim on behalf of himself and the nationwide class.

87. Mr. Smith incorporates the allegations above.

88. Mr. Smith claims that PayPal intentionally interfered with the contract between him and third-party companies with affiliate marketing programs.

89. There was a contract between Mr. Smith and third-party affiliate marketing programs.

90. PayPal knew of the arrangement between Mr. Smith and the affiliate marketing companies. PayPal is aware of affiliate marketing relationships because it takes advantage of them itself and it knows that shoppers navigate to retailers from content creator's affiliate links.

91. PayPal's conduct prevented performance of Mr. Smith's contracts with affiliate marketing programs. Operating as intended, those contracts would have awarded Mr. Smith with commissions for directing shoppers who purchased products on the websites.

92. PayPal either intended to disrupt the performance of Mr. Smith's affiliate marketing contracts or knew that disruption of performance was certain or substantially certain to occur from its conduct.

93. Mr. Smith was harmed because he lost out on commissions that he would have otherwise received. He received less income from his affiliate link business.

94. PayPal's conduct was a substantial factor in causing Mr. Smith's harm: but for PayPal's replacement of the affiliate codes, Mr. Smith would have received the commissions when shoppers used his link and completed a purchase.

**COUNT FOUR — INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

95. Mr. Smith brings this claim on behalf of himself and the nationwide class.

96. Mr. Smith incorporates the allegations above.

97. Mr. Smith claims that PayPal intentionally interfered with an economic relationship between Mr. Smith and third-party affiliate marketing programs that otherwise would have resulted in an economic benefit to Mr. Smith.

98. Mr. Smith and affiliate marketing programs were in an economic relationship that probably would have resulted in an economic benefit to Mr. Smith.

99. PayPal knew of the relationships between content creators and affiliate marketing programs in general and Mr. Smith's in particular.

100. PayPal engaged in a scheme in which it replaced Mr. Smith's affiliate marketing codes with its own, such that it wrongfully received the credit for purchases that should have been credited (i.e., that should have paid commission) to Mr. Smith.

101. By engaging in this conduct, PayPal intended to disrupt the affiliate marketing relationship or knew that disruption of the relationship was certain or substantially certain to occur when it replaced the affiliate marketing cookies with its own.

102. The relationship between Mr. Smith and the affiliate marketing programs was disrupted—the affiliate marketing programs paid commissions to PayPal that were properly owed to Mr. Smith, because he directed the purchaser to the retailer.

103. Mr. Smith was harmed because he lost out on commissions that he would have otherwise received. He received less income from his affiliate link business.

104. PayPal's conduct was a substantial factor in causing Mr. Smith's harm: but for PayPal's replacement of the affiliate codes, Mr. Smith would have received the commissions when shoppers used his link and completed a purchase.

**COUNT FIVE — VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

105. Mr. Smith brings this claim on behalf of himself and the nationwide class.

106. Mr. Smith incorporates the allegations above.

107. PayPal's scheme, as described in this complaint, constituted an unfair and fraudulent business practice under California's Unfair Competition Law.

108. PayPal's scheme is unfair because it diverts commissions to itself that would be properly awarded to Mr. Smith, who in fact drove the shopper to make the purchase. PayPal did not deserve the commissions it diverted, which were intended to reward the person that led the shopper to make the purchase. PayPal did nothing to lead shoppers to the website to make the purchase. PayPal's conduct undermines the online affiliate marketing business.

109. PayPal's scheme is fraudulent because PayPal advertises the Honey browser extension as a means for shoppers to save money. In fact, it diverts money to itself through the scheme described in this complaint. And it conceals the mechanisms it uses to replace affiliate codes with its own.

110. Mr. Smith was harmed because he lost out on commissions that he would have otherwise received. He received less income from his affiliate link business.

111. PayPal's conduct was a substantial factor in causing Mr. Smith's harm: but for PayPal's replacement of the affiliate codes, Mr. Smith would have received commissions when shoppers used his link and completed a purchase.

112. As a result of PayPal's violation of the Unfair Competition Law, Mr. Smith is entitled to the return of affiliate commissions that PayPal diverted to itself.

113. Mr. Smith is also entitled to restitution in the event that money damages are difficult or impossible to calculate. Even if money damages are available, such damages would not be adequate to address Mr. Smith's harm, which extends to the time he devoted to creating engaging content and

developing his affiliate program relationships.

114. In addition, Mr. Smith is entitled to reasonable attorney fees and costs.

115. Furthermore, as the violations are ongoing, PayPal should be enjoined from diverting affiliate commissions as described in this complaint.

## VIII.     RELIEF REQUESTED

116. Mr. Smith, on behalf of himself and other members of the class, asks the Court for the following relief:

    A.    An order certifying the proposed class under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), designating Mr. Smith as named representative of the class, and appointing the undersigned attorneys as class counsel under Rule 23(g);

    B.    Actual damages;

    C.    Punitive damages;

    D.    An order enjoining PayPal from diverting to itself affiliate commissions properly owed to others;

    E.    Attorney fees, expenses, and taxable costs;

    F.    Pre- and post-judgment interest; and

    G.    For other relief that the Court deems just and proper.

## IX.     JURY TRIAL DEMAND

117. Plaintiff Xavier Smith demands a jury trial for all issues so triable.

DATED this 24th day of January, 2025.

                        KELLER ROHRBACK L.L.P.

                        By: /s/ Christopher L. Springer
                            Christopher L. Springer (SBN 291180)
                            801 Garden Street, Suite 301
                            Santa Barbara, CA 93101
                            (805) 456-1496
                            Fax (805) 456-1497
                            cspringer@kellerrohrback.com

                            Derek W. Loeser (*pro hac vice* to follow)
                            Cari Campen Laufenberg (*pro hac vice* to follow)
                            Adele A. Daniel (*pro hac vice* to follow)
                            Andrew N. Lindsay (*pro hac vice* to follow)
                            Kylie N. Fisher (*pro hac vice* to follow)
                            1201 Third Avenue, Suite 3400
                            Seattle, WA 98101
                            Tel.: (206) 623-1900
                            Fax: (206) 623-3384
                            dloeser@kellerrohrback.com
                            claufenberg@kellerrohrback.com
                            adaniel@kellerrohrback.com
                            alindsay@kellerrohrback.com
                            kfisher@kellerrohrback.com

                            *Attorneys for Plaintiff*